IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| MICHAEL DEAN NABLO, | 4:14-cv-00327-JEG-HCA |
| Plaintiff(s), | |
| vs. | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | REPORT AND RECOMMENDATION (FILED UNDER SEAL) |
| Defendant(s). | |

Plaintiff Michael Dean Nablo seeks review of the Social Security Commissioner's decision denying his application for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401-434. This Court reviews the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g). The case is before the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The matter is fully submitted on the briefs.

I.      PROCEDURAL AND FACTUAL BACKGROUND

On April 18, 2011 Mr. Nablo filed an application for disability benefits alleging an onset date of December 1, 2010. (Tr. at 172). His claim was initially denied on May 25, 2011 and denied upon reconsideration on September 1, 2011. (Tr. at 118-121, 124-128). Mr. Nablo's hearing request was granted and a hearing before Administrative Law Judge ("ALJ") Tom Andrews was held on February 1, 2013. (Tr. at 53-112). On March 19, 2013 the ALJ issued an unfavorable decision, finding Mr. Nablo was not disabled. (Tr. at 18-30). Mr. Nablo requested a review of the ALJ's decision. The Appeals Council denied the request for review and the ALJ's decision became a final decision on July 3, 2014. (Tr. at 1-3). The Complaint [1] in this case was timely filed on August 21, 2014.

**A.    Educational and Vocational Factors**

Mr. Nablo was 47 years old when he filed for benefits. (Tr. at 172). He graduated from high school after being in some "special assignment classes." (Tr. at 65). He had past employment as a construction worker which was semi-skilled heavy work. (Tr. at 271).

**B.    Medical Evidence**

Mr. Nablo had a lengthy medical history pre-dating the alleged disability onset date of December 1, 2010. On April 23, 1981 Dr. Hughes at Marshalltown Area Community Hospital performed a right knee arthroscopy and arthrotomy, excision of medial meniscus fragment. (Tr. at 306). Dr. Lester at Marshalltown Area Community Hospital performed a left knee arthroscopy and removal of bucket-handle portion, medial meniscus on January 27, 1988. (Tr. at 304-05).

On March 5 and 20, 1990, Mr. Nablo underwent procedures to release his left and right volar carpal ligaments as a result of bilateral carpal tunnel syndrome, again with Dr. Lester at Marshalltown Area Community Hospital. (Tr. at 303). On August 15, 1991 Dr. Lester performed a left ulnar nerve transplant at elbow (ulnar nerve entrapment). (Tr. at 301). On March 16, 1992 Dr. Wanzak performed a bronchoscopy on Mr. Nablo to evaluate probable sarcoidosis. (Tr. at 310). Dr. Lester performed an anterior acromionectomy with resection distal clavicle, section of corcoacromial ligament, right shoulder following pre-operative diagnosis of impingement syndrome on August 24, 1993. (Tr. at 300). On August 10, 1994 Dr. Foley at Marshalltown Area Community Hospital performed a bilateral inguinal hernioplasty, umbilical hernioplasty on Mr. Nablo. (Tr. at 298-299).

A left knee arthroscopy and partial medial meniscectomy were performed by Dr. Cooper at Marshalltown Medical and Surgical Center on August 26, 2002. (Tr. at 297). On November 21, 2005 Dr. Cooper performed a right knee arthroscopy and partial medial meniscectomy on Mr.

Nablo. (Tr. at 296). Another right knee arthroscopy/partial medial meniscectomy/exclusion superomedial plica was performed on August 25, 2006 by Dr. Cooper. (Tr. at 293). Mr. Nablo had a laparoscopic appendectomy on November 25, 2006. (Tr. at 294).

After reporting a two-year history of constant right gluteal and posterior right leg pain, Mr. Nablo was evaluated at the Pain Medicine Clinic at Mary Greeley Hospital on April 2, 2007. An MRI of the lumbar spine showed minimal degenerative changes and no nerve root compression or displacement. Dr. Arnold Parenteau diagnosed piriformis syndrome, offered Mr. Nablo a trial injection of Depo Medrol and explained piriformis stretching exercises. (Tr. at 315-316). Mr. Nablo also was treated with physical therapy. (Tr. at 286). On April19, 2007 Mr. Nablo was discharged from physical therapy as his right hip pain had improved but Mr. Nablo was having significant right knee pain. He was compliant with piriformis stretching exercises. (Tr. at 554).

On November 14, 2007 Mr. Nablo underwent right shoulder arthroscopy with debridement labral tear/biceps tendon/glenoid (significant), right shoulder bursoscopy with subacromial decompression. Dr. Thomas Greenwald at Mary Greeley Hospital performed the surgery. (Tr. at 318-19). Mr. Nablo had another hernia repair procedure on November 20, 2007 performed by Dr. Foley at Marshalltown Medical and Surgical Center. (Tr. at 292). On November 21, 2007 Mr. Nablo had a repeat injection from Dr. Parenteau for recurrence of piriformis syndrome. (Tr. at 320).

On February 18, 2008 Mr. Nablo was examined by Dr. Cooper for right shoulder pain and weakness. Dr. Cooper ordered an MRI of the right shoulder with the thought Mr. Nablo had torn his rotator cuff. (Tr. at 552). The MRI showed a high-grade tear of subscapular muscle and torn biceps tendon. (Tr. at 551). Dr. Cooper performed a right shoulder rotator cuff repair on March 12, 2008. (Tr. at 275). Mr. Nablo followed up with Dr. Cooper after surgery and by April 24, 2008

was healing well and working on strengthening. (Tr. at 548). By May 13, 2008 Mr. Nablo had full elevation, full external rotation and essentially normal strength in his shoulder but Dr. Cooper advised him to do no heavy lifting out or overhead and to build up to full activity. (Tr. at 547). Physical therapy records from this time period note Mr. Nablo was progressing toward his short-term and long-term goals. (Tr. at 588).

Mr. Nablo had repeat injections for recurrence of piriformis syndrome on May 14, 2008 and September 16, 2008. He was encouraged to continue daily piriformis stretches and Dr. Parenteau discussed a trial of anti-inflammatories to spread out time between injections. (Tr. at 321-322).

On October 22, 2008 Dr. Thomas Greenwald performed a left shoulder arthroscopy with debridement of labral tear, left shoulder bursoscopy with subacromial decompression. (Tr. at 324). Mr. Nablo participated in some physical therapy post-operatively but continued to have some pain through his anterior and medial shoulder. (Tr. at 570).

On multiple occasions in 2009 Mr. Nablo received injections for his piriformis syndrome, on January 23, 2009, April 20, 2009 and July 30, 2009. Each time Dr. Parenteau stressed the importance of the piriformis stretch protocol and daily stretching. (Tr. at 326, 328, 330). Dr. Thomas at McFarland Clinic gave Mr. Nablo a steroid injection in his right knee on July 15, 2009 and saw Mr. Nablo for a pre-operative examination on September 21, 2009. (Tr. at 346, 347). On September 23, 2009 Dr. Greenwald performed a right knee arthroscopy with partial lateral meniscectomy, debridement chondromalacia – extensive. (Tr. at 332-33). By November 28, 2009 Mr. Nablo required another steroid injection in his right knee by Dr. Thomas at the McFarland Clinic. (Tr. at 345).

Mr. Nablo had recurrences of piriformis syndrome on May 10, 2010 and October 6, 2010, requiring repeat injections and instruction to continue with home exercise (Tr. at 334, 336-37). Dr. Thomas administered injections in both Mr. Nablo's knees on May 19, 2010 and October 26, 2010. (Tr. at 343, 344).

On December 7, 2010 Mr. Nablo reported to Dr. Thomas at McFarland Clinic that his arms and legs ached. He was on a statin drug and Dr. Thomas stopped the statin prescription as a possible cause. (Tr. at 342). By December 22, 2010, however, Mr. Nablo still reported the tops of his legs and back were aching. Dr. Thomas prescribed a pain medication and directed Mr. Nablo to continue to stay off statin drugs. An MRI was planned. (Tr. at 341).

Mr. Nablo had a repeat injection for recurrent piriformis syndrome on January 18, 2011. (Tr. at 335).

On February 1, 2011 Mr. Nablo returned to see Dr. Thomas at McFarland Clinic for assessment of his complaint of pain "all over" lasting a month and nausea. Mr. Nablo said he had been going to physical therapy as recommended by Dr. Parenteau. He complained of joint pain primarily in his knees, hips, neck, shoulders, elbows, wrists, hands and fingers, with his knees puffy at times. On physical exam, Dr. Thomas observed Mr. Nablo's hands were slightly swollen but there were no joint effusions or redness or rash. Mr. Nablo demonstrated some pain on extremes of range of motion of elbows and shoulders. Dr. Thomas planned to send him for a rheumatology consultation. (Tr. at 542). Dr. Thomas administered injections in both Mr. Nablo's knees on February 9, 2011. (Tr. at 543). Meanwhile, on February 17, 2011 Mr. Nablo had an orthopedic spine consultation with Dr. Kaspar for evaluation of his complaints of pain for the last two to three months, interscapular and radiating down both posterior upper forearms dorsally, down to the dorsum of the hands and into his palms, bilateral sharp shooting groin pain, anterior

knees and right anterior shin but arm pain most pressing on date of evaluation. Dr. Kaspar noted Mr. Nablo had "markedly puffy, swollen hands and dramatic disuse thereof" with inability to make a grip on either side due to swelling and pain down arms. He demonstrated bilateral positive Hoffmann's signs, worse on the right, and some hyperreflexia on some motor groups, including the knees, right biceps and brachioradialis. Dr. Kaspar prescribed a Medrol Dosepak to give Mr. Nablo a systemic boost of steroid. At that time Dr. Kaspar thought Mr. Nablo's physical findings were dramatic and urgent enough to order an MRI the next day. (Tr. at 369-372). The subsequent MRI cervical spine on February 18, 2011 showed mild degenerative changes and no obvious site of upper extremity nerve root impingement was seen. (Tr. at 364).

Mr. Nablo first saw Dr. David Gerbracht, a rheumatologist at the McFarland Clinic, on February 22, 2011 to assess Mr. Nablo's complaints of stiffness and aching since December 2010, all in his upper shoulders and anterior hips/thighs/knees associated with swelling and stiffness in fingers, wrists and knees. After taking Mr. Nablo's history and conducting a physical examination, Dr. Gerbracht believed Mr. Nablo had developed rheumatoid arthritis ("RA"). Upon completion of the Medrol Dosepak which Dr. Kaspar had prescribed, Dr. Gerbracht planned to start Mr. Nablo on Prednisone to maintain functional capability. (Tr. at 367-368). After reviewing the MRI cervical spine results and having received Dr. Gerbracht's diagnosis of rheumatoid type arthritis, Dr. Kaspar indicated he would follow up with Mr. Nablo as needed. (Tr. at 372).

After Mr. Nablo started taking Prednisone he was examined by Dr. Gerbracht on March 14, 2011. Dr. Gerbracht observed trace tenosynovial swelling of the left second, third and fourth digital flexor tendon sheaths and right second and third digital flexor tendon sheaths; Mr. Nablo's hand grip was decreased about 20% bilaterally. His wrists and elbows, knees and ankles were unremarkable. Mr. Nablo had painless range of motion of hips and minimal discomfort on

abduction of shoulders beyond 90 degrees. Dr. Gerbracht started Mr. Nablo on Methotrexate in increasing dosages with follow-up blood work and Prednisone. (Tr. at 367).

Mr. Nablo had a follow-up visit with Dr. Gerbracht on May 12, 2011. Mr. Nablo felt significantly better but still had significant stiffness in his fingers, wrists, and shoulders. He had no adverse toxicity effects from Methotrexate but reported some difficulty sleeping and variable fatigue. He reported to Dr. Gerbracht it was difficult to work as a construction contractor due to his rheumatoid arthritis. Dr. Gerbracht increased dosages of Methotrexate and decreased Mr. Nablo's Prednisone dosages. The plan was to apply for treatment with Humira to maintain functional capability. (Tr. at 391-92).

On May 19, 2011 Mr. Nablo had an office visit with Dr. Greenwald to discuss coordinating his osteoarthritis knee conditions in conjunction with the diagnosis of rheumatoid arthritis, which precluded Mr. Nablo from being candidate for unicompartmental arthroplasty. Dr. Greenwald would try to "put off" total knee arthroplasty as long as possible given Mr. Nablo was only in his late 40's. An injection in right knee was administered. (Tr. at 381). An x-ray of Mr. Nablo's right knee that day showed severe medial compartmental joint space narrowing. (Tr. at 389).

A state consultant, Gary Cromer, M.D, undertook a Physical Residual Functional Capacity Assessment by record review on May 24, 2011. (Tr. at 398-405). Dr. Cromer checked boxes indicating Mr. Nablo could lift twenty pounds occasionally, ten pounds frequently; stand or walk/sit about six hours in an eight-hour day; unlimited pushing or pulling; occasionally climb ramp/stairs, ladder/ropes, scaffolds; balance, stoop, kneel but never crouch or crawl; had limited reaching in all directions and limited handling but unlimited fingering or feeling. Mr. Nablo should avoid exposure to extreme cold and vibration. Dr. Cromer understood Mr. Nablo's rheumatoid arthritis had recently been diagnosed and that treatment was improving his condition. Therefore,

Dr. Cromer projected the RFC to December 1, 2011 "at which time function as outlined would not be precluded." (Tr. at 405).

On June 10, 2011 Mr. Nablo had a follow-up appointment with Dr. Gerbracht. Mr. Nablo had increased his Methotrexate without adverse side effects and decreased his dosage of Prednisone. On physical examination Dr. Gerbracht observed some stiffness in Mr. Nablo's fingers and wrists with trace tenosynovial swelling of the second, third, and fourth digital flexor tendon sheaths and hand grip decreased 30%. Mr. Nablo had been approved for treatment of his RA with Humira. (Tr. at 384).

Dr. Thomas conducted a pre-operative physical on Mr. Nablo on June 27, 2011, clearing Mr. Nablo for surgery. (Tr. at 385-388). On July 1, 2011 Dr. Greenwald performed right knee arthroscopy with partial medial and lateral meniscectomy and debridement chondromalacia. (Tr. at 424-427). Mr. Nablo saw Dr. Greenwald in follow-up on July 26, 2011. The incision from surgery had healed and Mr. Nablo had good range of motion. However, due to the presence of medial "bare bone" involving the tibia and femur, Dr. Greenwald thought Mr. Nablo would need a "medial unloading brace." (Tr. at 433). On July 29, 2011 Mr. Nablo reported anxiety to Dr. Thomas at McFarland Clinic for which Dr. Thomas prescribed Citalopram. (Tr. at 535).

Mr. Nablo called McFarland Clinic on August 4, 2011 reporting he was having issues with confusion and a decline in clarity. His primary care physician had prescribed Citalopram for his symptoms but Mr. Nablo had not started the medication. He reported he was sleeping poorly because of pain in his hands and fingers. The nurse recommended continuing to take his Prednisone prescription and a follow-up visit with his primary care physician. (Tr. at 442)

A follow-up visit with Dr. Gerbracht occurred on August 26, 2011. On physical examination, there was no overt synovitis or tenosynovitis in Mr. Nablo's fingers, wrists, elbows,

knees, ankles or feet; he had painless range of motion of shoulders and hips. (Tr. at 445). Dr. Gerbracht planned to continue decreasing Mr. Nablo's Prednisone dosage, and continue his Methotrexate, folic acid and Humira, as well as Cyclobenzaprine for sleep, along with monthly toxicity checks. (Tr. at 446). On September 29, 2011 Mr. Nablo called McFarland Clinic to report increased joint pain in his hands, wrists, knees and hips. Dr. Gerbracht recommended increasing his Prednisone to 15 mg. daily for five days, then tapering downwards to 5 mg. daily. (Tr. at 454).

On October 10, 2011 Mr. Nablo called to report he was feeling little benefit from the Prednisone taper and was experiencing continued pain and swelling in his hands and wrists. Dr. Gerbracht recommended changing to 5 mg. of Prednisone in the morning and 5 mg. at night. A follow-up appointment was scheduled. (Tr. at 458). At the October 18, 2011 appointment with Dr. Gerbracht, on physical examination, Mr. Nablo had some minimal puffiness in his fingers but no overt tenosynovitis. His hand grip was decreased 20% to 30% and there was some mottling of skin on his palms. Tinel's sign and Phalen's sign were negative bilaterally, reflexes were 2+/5 in both upper extremities. Mr. Nablo's wrists, elbows, knees, ankles and feet were free of any synovitis or tenosynovitis. Dr. Gerbracht was uncertain whether Mr. Nablo's hand symptoms were due to low-grade tenosynovitis from RA or whether it was a neuropathy. He continued Mr. Nablo's dosage of RA medications and adjusted his Prednisone to 10 mg. in the morning and 5 mg. in the evening for a week with follow-up. (Tr. at 462-63).

On October 20, 2011 Dr. Greenwald wrote a letter to Mr. Nablo's attorney outlining Mr. Nablo's functional capabilities. Mr. Nablo had difficulty with stooping and manual labor-type activities. Mr. Nablo could sit for six hours out of eight-hour work day. Chronic pain could interfere with Mr. Nablo's attention and concentration. He would need a five-minute break every two hours to take weight off his feet and elevate his right lower leg. Dr. Greenwald estimated Mr.

Nablo might need to absent from work every couple of weeks because of knee pain and would work at a slower pace. (Tr. at 438-439).

Mr. Nablo had a follow-up appointment with Dr. Gerbracht on October 25, 2011. He reported feeling better but still had a burning sensation in his hands, right hand more than left. On physical examination Mr. Nablo still had a mottled appearance to his palms but no appreciable synovitis or tenosynovitis in his extremities and no peripheral edema. Tinel's sign was positive on the right, plus/minus on the left and hand grip decreased a good 20%. Dr. Gerbracht continued adjustment of Mr. Nablo's Prednisone dosage and injected his right carpal tunnel with Depo-Medrol. Mr. Nablo was to return in a week. (Tr. at 467). On October 31, 2011 during his return visit, Mr. Nablo reported to Dr. Gerbracht the injection into his right carpal tunnel had not helped and he complained of some paresthesias in both hands, right greater than left. No active synovitis or tenosynovitis was observed in his extremities; his hand grip at most was decreased 10%. Mr. Nablo had painless range of motions of his shoulders and hips. Tinel's sign was positive bilaterally and no overt tenosynovial swelling was observed on the volar aspect of his wrists. Dr. Gerbracht opined it was likely bilateral carpal tunnel syndrome not related to RA and planned to proceed with bilateral nerve conduction velocity studies ("EMG") to confirm median nerve impingement. In the meantime Mr. Nablo was directed to wear a nocturnal wrist splint on right wrist and if beneficial, also on his left wrist. His blood pressure was to be checked twice a week and if it remained high, he was to see Dr. Thomas to adjust his blood pressure medication. (Tr. at 476).

Dr. Kitchell conducted an EMG on November 8, 2011. The motor nerve conduction study of the right median motor study nerve showed prolonged distal latency. All remaining nerves were within normal limits. (Tr. at 483).

Mr. Nablo saw Dr. Thomas on December 8, 2011 and received steroid injections in both knees. (Tr. at 527-28).

On January 6, 2012 Mr. Nablo was referred to physical therapy at McFarland Clinic. Therapist Sarah Peterman found Mr. Nablo had decreased strength and activity tolerance for activities of daily living consistent with diagnoses of RA and bilateral carpal tunnel. She recommended swimming at the YMCA for low impact exercise for entire body and educated Mr. Nablo on motivation and mood "as this will be a very long activity to note changes in the end" based on his deconditioned state. Treatment was to include manual therapy, range of motion, progressive resistive strengthening, posture training and body mechanics, cardiovascular exercises, desensitization, orthotic fabrication and a home program. They set goals to increase Mr. Nablo's grasp strength and increase his time spent in functional tasks. (Tr. at 518-519). By January 24, 2012 he was discharged from physical therapy. Mr. Nablo attended seven visits with one cancellation. Mr. Nablo reported ongoing pain with no significant change since initiating therapy but reported having a better understanding of postural mechanics and that he was continuing to attempt some exercises. Therapist Sarah Peterman observed Mr. Nablo demonstrated a slight increase in strength but was otherwise very painful systemically secondary to his multiple medical issues. He demonstrated considerable deconditioned state which made specific strengthening difficult in the hands. Mr. Nablo did demonstrate independence with his home program and was able to complete more long-term activities such as cooking for greater than fifteen minutes. (Tr. at 512-513).

Mr. Nablo had an appointment with Dr. Gerbracht on January 26, 2012. Dr. Gerbracht noted Mr. Nablo had seen Dr. Friederich, who did not believe Mr. Nablo had any active carpal tunnel impingement and thought the symptoms Mr. Nablo had been feeling in October/November

were likely residual from his previous carpal tunnel issues. Mr. Nablo reported he was seeing Dr. Greenwald for his knees and they were taking a conservative treatment approach. On physical examination there was no observable synovitis or tenosynovitis in his extremities nor significant discomfort on range of motion of shoulders and hips. Dr. Gerbracht observed mild hypertrophic change in the medial compartment of both knees but Mr. Nablo's gait was not antalgic. His hand grip was decreased 10% to 20%. Dr. Gerbracht found no thenar or hypothenar atrophy and no intraosseous muscle atrophy. Tinel's sign remained positive bilaterally. Dr. Gerbracht believed Mr. Nablo's RA was clinically suppressed at this time and continued his medications. (Tr. at 695-696).

On February 27, 2012 Dr. Friederich saw Mr. Nablo for evaluation of his carpal tunnel syndrome. Mr. Nablo reported minimal difficulty with numbness and tingling. On physical examination he was able to bring his fingers to his palm and had good extension; sensation was intact. They discussed the possibility of an injection in one or two joints. Mr. Nablo would follow up as needed. (Tr. at 691).

Mr. Nablo received steroid injections in both knees during a March 26, 2012 visit with Dr. Thomas at McFarland Clinic. (Tr. at 541).

On April 10, 2012 Dr. Greenwald met with Mr. Nablo to review the status of his knees in conjunction with his RA. Dr. Greenwald indicated Mr. Nablo met the criteria for total knee arthroplasty. Mr. Nablo wanted the procedures performed. Awaiting surgical scheduling, Mr. Nablo would continue with corticosteroid injections when needed. (Tr. at 684-685). Dr. Gerbracht saw Mr. Nablo on April 26, 2012. Mr. Nablo reported being "quite free" of inflammatory joint symptoms. No active synovitis or tenosynovitis was found in his extremities; his hand grip continued to be decreased 10% to 20%. Mr. Nablo's medications were continued with Humira to be withheld for two-week periods before and after knee surgery. (Tr. at 679-680).

Dr. Greenwald performed a right total knee arthroplasty on June 27, 2012. Mr. Nablo tolerated the procedure well and was discharged on June 30, 2012. (Tr. at 624-633). A left total knee arthroplasty was performed on July 11, 2012. (Tr. at 600). Following the latter procedure, Mr. Nablo had persistent pain in his left knee and episodes of near syncope, passing out when he went to shower. An EKG was normal but a CAT scan of his chest showed bilateral pulmonary emboli had developed in spite of prophylactic Lovenox at home. Mr. Nablo was admitted to the hospital, treated with Lovenox and Coumadin and discharged on Coumadin when he was stable, to follow with his primary care physician. (Tr. at 599-612).

On August 16, 2012 Mr. Nablo was seen by Dr. Buck in Dr. Greenwald's absence. Mr. Nablo had some drainage and pain in his left knee. Dr. Buck cleaned the wound and prescribed an antibiotic to minimize chances for a secondary infection. (Tr. at 666). Mr. Nablo had an appointment on August 21, 2012 with a nurse practitioner at Primary Health Care to establish care as new patient. (Tr. at 775). At that visit Mr. Nablo complained of joint pain, swelling, muscle weakness, and stiffness. The nurse practitioner noted the clinic would review Mr. Nablo's records before making any changes in his treatment plan. (Tr. at 776). On August 23, 2012 Mr. Nablo saw Dr. Gerbracht. Because Mr. Nablo was losing his insurance at the end of month, he told Dr. Gerbracht he was transferring his primary care to Primary Health in Marshalltown. Dr. Gerbracht noted Mr. Nablo's recent total knee replacements and that the left incisional wound was healing nicely. On physical examination Dr. Gerbracht noted Mr. Nablo demonstrated no overt active synovitis or tenosynovitis and had well-fitted right total knee replacements. The left knee replacement lacked ten degrees of extension and could be flexed to 90 degrees. Mr. Nablo's hand grip remained decreased. Dr. Gerbracht continued Mr. Nablo's medications as his RA was responding to them. (Tr. at 661). At an August 24, 2012 follow-up visit with Dr. Greenwald, the

doctor noted Mr. Nablo's "knees … look[ed] super" with range of motion 0-130 degrees on right and 0-120 degrees on left. His radiographs looked fine. Mr. Nablo was to continue with aggressive physical therapy and recheck in two months. (Tr. at 653).

Mr. Nablo's primary care physician, Dr. Thomas, wrote a letter on August 31, 2012 addressing Mr. Nablo's physical capabilities: he reported Mr. Nablo had trouble bending over because of pain in his back and stooping because of pain in his hips and knees. Mr. Nablo would need to elevate his legs periodically because of his knee surgeries. Dr. Thomas thought Mr. Nablo would probably need an unscheduled break every 90 to 120 minutes; he might miss work periodically and would work at a reduced pace. (Tr. at 544). Mr. Nablo was discharged from physical therapy on August 31, 2012. The physical therapist noted no functional limitations: "Patient is able to functionally perform all activities of daily living that he still chooses to participate in." (Tr. at 700). Mr. Nablo could ascend/descend four flights of stairs in a safe and controlled manner. (*Id.*)

In a September 4, 2012 checklist response from Dr. Gerbracht, he indicated that if Mr. Nablo were to attempt sedentary work, he would not expect Mr. Nablo to be able to sit for six hours out of an eight-hour work day, Mr. Nablo would require unscheduled work breaks at least every sixty minutes for five minutes, but would not need to elevate his legs to waist level. Mr. Nablo could not stoop occasionally, would work at a slower pace at least one-third of the time, would experience "good days" and "bad days" because of pain and would miss three or more days of work a month. (Tr. at 546).

Mr. Nablo visited Primary Health Care on September 24, 2012. At that time he complained of constant pain and sleep disturbance since his knee surgeries, and ankle swelling. (Tr. at 768). The nurse practitioner prescribed Cyclobenzaprine for sleep and changed Mr. Nablo's Warfarin

dosage schedule. (Tr. at 771). At a September 26, 2012 visit at Primary Health Care, Mr. Nablo reported his knee pain and sleep disturbance were improving with medication. (Tr. at 765).

Dr. Greenwald saw Mr. Nablo again on October 9, 2012. He noted Mr. Nablo "look[ed] absolutely super status post bilateral total knee arthroplasties." There was a "hint of swelling" on the left side consistent with that surgery being later. Mr. Nablo was to see Dr. Greenwald on an as needed basis. (Tr. at 794).

At a December 19, 2012 visit with Dr. Gerbracht, Mr. Nablo complained of some variable stiffness in his shoulders and nonspecific paraesthesia-type symptoms in his fingers from his previous carpal tunnel procedures. Dr. Gerbracht noted Mr. Nablo showed no active synovitis or tenosynovitis in his extremities and well-fitted bilateral total knee replacements. He found no rheumatoid nodules. (Tr. at 785) Dr. Gerbracht opined Mr. Nablo's RA was clinically suppressed, and his osteoarthritis of knees had been treated surgically. (Tr. at 786). Mr. Nablo expressed a concern whether he would have continued coverage for Humira. (Tr. at 785). He saw a physician's assistant at Primary Health Care to be treated for pharyngitis on December 21, 2012. Mr. Nablo was not depressed. (Tr. at 806-08).

On January 11, 2013 Mr. Nablo had another office visit at Primary Health Care with a physician's assistant. At that time he reported feeling depressed nearly every day and a loss of interest/pleasure in doing things. He told the physician's assistant he had had suicidal thoughts. (Tr. at 801). The physician's assistant added a prescription for Cymbalta; Mr. Nablo was to see a mental health provider. (Tr. at 804).

### C.    Hearing Testimony

At hearing before ALJ Andrews on February 1, 2013 Mr. Nablo and vocational expert (VE) Vanessa May testified. Mr. Nablo was represented by attorney Timothy Tripp.

15

Mr. Nablo was 49 years old and lived in Marshalltown, Iowa. He graduated from high school. He had been married for thirty-two years. (Tr. at 65-66).

In the fifteen years before the hearing Mr. Nablo had worked as a general contractor/construction worker, repairing and building home items and working on home residential construction. (Tr. at 66). He had his own company but testified he had to stop working as he experienced continued and increasing pain as time passed. (Tr. at 66-67). Mr. Nablo closed his business in December of 2010 when he was diagnosed with rheumatoid arthritis. (Tr. at 67).

Mr. Nablo described his typical day as waking up early, limbering up in bed just to get out of bed, and going to his recliner and watching TV until his family awoke. (Tr. at 69). He testified his normal daily pain level was a three or four on a scale of one to ten, ten being the worst pain. (Tr. at 69-70). On a "bad" day his pain might start at a five or six and increase through the day with minimal activity, then start higher the next day and build to nine. (Tr. at 70). Mr. Nablo described his pain as being in every part of his body from his toes to his nose. (*Id.*) On "bad" days he sat/lay on the couch or recliner all day with the TV on. He did not read as he had problems comprehending what he had read. He could follow basic instructions if accompanied by a picture. (Tr. at 70-71). He testified his ability to follow instructions had worsened with pain as it was hard to focus. (Tr. at 71-72). Mr. Nablo took Cymbalta, an antidepressant, to help with the pain along with Hydrocodone. (Tr. at 72-73). He estimated he might have three to five "bad" days in a two-week period. (Tr. at 73).

In response to a question about a doctor's note on September 26, 2012 that Mr. Nablo had reported pain was not affecting his activities, Mr. Nablo testified he probably was medicated before he went to that appointment. (Tr. at 73-74).

On a day with "normal" pain level of three, Mr. Nablo testified he might sit in his recliner, sometimes with his feet up, for a couple of hours, then get up and move around. (Tr. at 74-75). He might load the dishwasher but could not hand wash the dishes because his fingers had a weak grip. (Tr. at 75). Because his knees did not bend well, he bent at the waist, putting a strain on his lower back. (Tr. at 75-76). He usually tried to support himself on something when he bent over or went really slowly. (Tr. at 76).

Mr. Nablo could drive but testified he did not drive as much as he had before 2010 because he would get confused. His wife drove him to the hearing. (Tr. at 76). He went to church and was a Cub Scout leader for his grandson. (Tr. at 77). He had to cancel one Cub Scout meeting when he was in pain. (*Id.*) Mr. Nablo testified he felt some depression because he could not do the things he used to. (Tr. at 78-79). As an example, he testified he could not replace a kitchen faucet as he could not lay on his back and reach the knobs, nor use the tools needed. (Tr. at 80-81).

Other past work history besides his construction job included a paper route in junior high school and stocking shelves at a Walgreens in high school (Tr. at 83-84). Mr. Nablo had worked construction since graduating from high school. (Tr. at 84). He was in the Marines for a few weeks, but was injured on an obstacle course and discharged. (Tr. at 85-86).Before 1999 Mr. Nablo had a low earnings history in construction and worked part-time as a pre-loader for UPS for a brief period of time. (Tr. at 87-88). Beginning in 2006 his earnings dropped substantially when he was doing construction jobs on his own. (Tr. at 89-90). Mr. Nablo noted there was a period of time when he had multiple surgeries in a twelve-month period which decreased his earnings. (Tr. at 91). While his wife was employed he had health insurance through her employment but at the time of hearing his wife was employed only part-time and was a full-time student; therefore he did not have insurance. (Tr. at 91-92).

Because he would no longer have insurance, Mr. Nablo made the decision with his doctors to have surgery on both knees done in a short time span in 2012. (Tr. at 94-95). He testified the sharp, pinching pain in his knees was gone, although he was not happy with strength, mobility and flexibility of them. (Tr. at 95). He admitted they were getting more flexible and stronger as he healed. (Tr. at 96).

The ALJ propounded a hypothetical to the VE about light activity for an individual who could never crouch or crawl, who could occasionally climb ladders, ropes or scaffolds, ramps or stairs or need to balance, stoop or kneel, with some manipulative limitations bilaterally which limited reaching to no more than frequently, handle or grip no more than frequently, and environmental limitations such as avoiding concentrated exposure to extreme cold or excessive vibrations. The VE testified that the hypothetical individual could not engage in the past work in which Mr. Nablo had engaged. (Tr. at 105). She did find other jobs which would be available such as information clerk, retail marker, photocopy machine operator, all at a light and unskilled level. (Tr. at 106). Changing the hypothetical to sedentary level with climbing ladders, ropes, scaffold, ramps or stairs never occurring, the light level jobs would not be available, but the VE said there could be jobs available for such an individual such as document preparer, addresser, telephone quotation clerk. (Tr. at 106-107). On cross-examination, in response to an addition to either hypothetical that the individual would work twenty percent slower than other employees, the VE testified that individual would not be able to perform the jobs identified nor would there be other work for that individual. (Tr. at 107-108). For an individual who would miss work two or more times a month, the VE said that individual would not keep an unskilled job. (Tr. at 108). Finally, an individual who needed frequent unscheduled work breaks through the day would not be able to perform the jobs the VE identified. (Tr. at 109).

## II.    FINDINGS OF THE COMMISSIONER

In order to qualify for benefits under the Act, Mr. Nablo must have been disabled. "Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Commissioner uses the following five-step evaluation to determine whether a claimant is disabled within the meaning of the Act and therefore eligible for disability benefits: "whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *Byes v. Astrue*, 687 F.3d 913, 915 n.2 (8th Cir. 2012)(quoting *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009)). If at step (4) the ALJ makes a finding that a claimant is unable to perform his/her past relevant work, the burden shifts to the Commissioner to prove with medical evidence the claimant "has a residual functional capacity to do other kinds of work, and that other work exists in significant numbers that [claimant] can perform." *Nalley v. Apfel*, 100 F. Supp. 2d 947, 952-53 (S.D. Iowa 2003)(citing cases).

Following the requisite five-step evaluation, the ALJ issued the written decision at issue in this case on March 19, 2013 and made the following findings:

1.    The claimant last met the insured status requirements of the Social Security Act through March 31, 2012.

2.    The claimant has not engaged in substantial gainful activity during the period from his alleged onset date of December 1, 2010 through his date last insured of March 31, 2012 (20 C.F.R. 404.1571 *et seq.*).

3.      Through the date last insured, the claimant had the following severe impairments: rheumatoid arthritis and osteoarthritis, treated, in part, with bilateral total knee replacements (20 C.F.R. 404.1520(c)).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairment sin 20 C.F.R. Part 404, Subpart P, Appendix 1 (10 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that, through the date last insured – March 31, 2012 – the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except he should never crouch or crawl; he should no more than occasionally climb ramps, stairs, ropes, ladders, and scaffolds; he should no more than occasionally balance, stoop, and kneel; bilaterally, he should not need to reach more than frequently, including overhead reaching; bilaterally, he should not need to handle (that is, perform gross manipulation or use the whole hand to seize, hold, grasp, grip and turn objects) more than frequently; he should avoid concentrated exposure to extreme cold; and he should avoid concentrated exposure to excessive vibration (for example, tools that cause excessive vibration).

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. 404.1565).

7.      The claimant was born on February 11, 1964 and was 48 years old, which is defined as a younger individual age 45-49, on the date last insured (20 C.F.R. 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.    Through the date last insured, considering the claimant's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. 404.1569 and 404.1569(a)).

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from December 1, 2010, the alleged onset date, through March 31, 2012, the date last insured (20 C.F.R. 404.1520(g)).

(Tr. at 20-30).

## III.  STANDARD OF REVIEW

This Court "will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)(quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)); *see also Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013); *Young v. Astrue*, 702 F.3d 489, 491 (8th Cir. 2013); 42 U.S.C. § 405(g)("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

> Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. To determine whether substantial evidence supports the decision, we must consider evidence that both supports and detracts from the decision. If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently.

*Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010)(internal citations and quotation marks omitted); *see Phillips v. Colvin*, 721 F.3d 632, 625 (8th Cir. 2013); *Kamann*, 721 F.3d at 950; *Young*, 702 F.3d at 491. The ALJ's decision will not be overturned so long as the decision "falls within the available zone of choice." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011); *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009)(quoting *Bradley v. Astrue*, 528 F.3d 1113, 115 (8th Cir. 2008)). "The ALJ's decision 'is not outside the zone of choice simply because [the Court] might have reached a different conclusion had [the Court] been the initial finder of fact.'" *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009)(quoting *Bradley*, 528 F.3d at 1115); *see Buckner*, 646 F.3d at 556.

## IV.    DISCUSSION

Plaintiff's challenge to the ALJ's determination focuses on two issues: (1) the ALJ failed to include Mr. Nablo's shoulder and hand pain as severe impairments and (2) the ALJ failed to properly weigh the opinion evidence of the treating physicians. He argues the Court should reverse the Commissioner and award benefits, or alternatively reverse and remand for further administrative development. Defendant responds that substantial evidence supports the ALJ's evaluation of Mr. Nablo's shoulder and hand impairments and his treatment of the treating physicians' opinions and that reversal is not a proper remedy.

### A.    Shoulder and Hand Pain as Severe Impairments

With respect to his first challenge to the ALJ's findings, plaintiff argues that by assigning limits to Mr. Nablo's bilateral hand and shoulder pain, the ALJ has acknowledged them to be severe. If the impairments are severe, he continues, the limitations accompanying them would be more restrictive than found by the ALJ. (Pl. Brief [9] at 13). Defendant responds the ALJ's assessment of the impairments and inclusion of limitations to account for them was proper under 20 C.F.R. § 404.1545(a)(2). (Def. Brief [10] at 6). Alternatively, defendant argues no harm arose from the ALJ's finding Mr. Nablo's hand and shoulder impairments were not severe because he found one other impairment was severe. (*Id.*)

An ALJ's determinations regarding the effect of impairments, severe and nonsevere, are governed in part by 20 C.F.R. § 404.1545(a)(2) which notes that "We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . . when we assess your residual functional capacity." *See also* 20 C.F.R. § 416.945(a)(2) (in assessing RFC, ALJ must consider "all of [a claimant's] medically determinable impairments . . . , including . . . impairments that are not

'severe'"); § 416.923 (ALJ must "consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately would be of sufficient severity."). Therefore, the Court agrees that the ALJ's inclusion of limitations for Mr. Nablo's bilateral hand and shoulder pain is not an acknowledgment that they are severe.

The ALJ made a specific finding that Mr. Nablo's bilateral hand and shoulder conditions were nonsevere, discussing the medical records pertaining to them, all of which predated the alleged onset date by several years. (Tr. at 20, 23, 324, 547). Notably, the record is absent of complaints about significant hand or shoulder pain after Mr. Nablo's hand and shoulder surgeries until the diagnosis of RA made in December 2011. Mr. Nablo's hand symptoms, which occurred in conjunction with his RA, were felt to be residuals of his prior carpal tunnel impingement; there was no active carpal tunnel condition. (Tr. at 691). There were no "medically necessary restrictions" in the records concerning Mr. Nablo's hand and shoulder symptoms, which also supports the ALJ's nonseverity finding. *See Mittelstedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000). Although finding the conditions were not severe, the ALJ did take them into account in describing Mr. Nablo's RFC: "bilaterally, he should not need to reach more than frequently, including overhead reaching; bilaterally, he should not need to handle (that is, perform gross manipulation or use the whole hand to seize, hold, grasp, grip and turn objects) more than frequently." (Tr. at 22).

There is substantial support in the record for the ALJ's finding that Mr. Nablo's bilateral hand and shoulder pain were nonsevere impairments. His finding on this point was not in error.

B.      Opinion Evidence of Treating Physicians

Finally, plaintiff argues the ALJ failed to give proper weight to the opinion of Mr. Nablo's treating physicians, Drs. Greenwald, Thomas and Gerbracht, concerning his work capabilities. All

expressed the opinion that Mr. Nablo would miss up to two or three days of work a month and would perform at a slower pace than co-workers. (Tr. at 438-39, 544, 546). If the ALJ accepted their opinions, the VE testified those factors would preclude employment. (Tr. at 107-109). Defendant responds the ALJ properly weighed the medical evidence and the RFC incorporates those portions of the doctors' opinions supported by the medical evidence.

An ALJ "must give 'controlling weight' to a treating physician's opinion if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015)(quoting *Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007) and citing S.S.R. 96-2p, Policy Interpretation Ruling, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, 1996 WL 374188 (July 2, 1996)). The treating physician's opinion may be given "limited weight if it provides conclusory statements only, or is inconsistent with the record." *Samons v. Astrue,* 497 F.3d 813, 818 (8th Cir. 2007)(quoted in *Papesh*, 786 F.3d at 1132). "Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight." *Hamilton v. Astrue,* 518 F.3d 607, 610 (8th Cir.2008) (citing *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir.2001)); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c). "[W]hile entitled to special weight, a treating physician's opinion does not automatically control, particularly if the treating physician evidence is itself inconsistent." *House v. Astrue,* 500 F.3d 741, 744 (8th Cir.2007) (internal quotation omitted). "Moreover, a treating physician's opinion that a claimant is 'disabled' or 'unable to work,' does not carry 'any special significance,' 20 C.F.R. § 416.927(e)(1), (3), because it invades the province of the Commissioner to make the ultimate determination of disability." *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009)(quoting *House,* 500 F.3d at 745).

1.    Dr. Greenwald

In his October 20, 2011 opinion letter, Dr. Greenwald noted Mr. Nablo had "significant right knee arthritis" with degenerative changes which included "bare bone" into the knee joint, causing pain with activity.  (Tr. at 438). He summarized the conservative treatments attempted, which included injections, icing and anti-inflammatory medications. (*Id.*) Dr. Greenwald gave the opinion that Mr. Nablo would have difficulty with stooping and with his manual labor type activities, as he needed to elevate his knee throughout the day. (*Id.*) He thought Mr. Nablo could sit for six hours in an eight-hour work day. (*Id.*) Dr. Greenwald also gave the opinion that Mr. Nablo would need a five minute work break every two hours to get his weight off his feet,  might "perhaps" be off work every couple of weeks because of knee pain, and should be allowed to work at a slower pace. (Tr. at 48-49).

The ALJ reviewed Dr. Greenwald's records in some detail and found that the "functional limitations for absences and pace [were] vague and not supported by [Dr. Greenwald's] treatment notes." (Tr. at 24).

Dr. Greenwald's opinion letter predates Mr. Nablo's subsequent bilateral knee surgery in the summer of 2012, which Dr. Greenwald indicated showed "super" results. (Tr. at 653, 794). In his final note, Dr. Greenwald said both he and Mr. Nablo were "quite pleased with the results of his surgical reconstruction and rehabilitative effort" and he would see Mr. Nablo on an as-needed and yearly basis. (Tr. at 794). Mr. Nablo's discharge physical therapy records on August 31, 2012 noted Mr. Nablo had full strength in his knee(s), had achieved satisfactory range of motion, could ascend and descend four flights of stairs without catching or instability and had been compliant with his home exercise program. (Tr. at 700-701).

Given this state of the medical records, the ALJ did not err in according less weight to the functional limitations concerning absences and pace offered by Dr. Greenwald prior to the bilateral knee surgeries.

2. Dr. Thomas

Dr. Thomas had a thirty-year treatment history with Mr. Nablo, reporting in his August 31, 2012 letter that Mr. Nablo had been a hard worker in construction and had "overused" his body. (Tr. at 544). Dr. Thomas led off with a general opinion that Mr. Nablo was "disabled from any and all forms of gainful employment due to severe degenerative arthritis primarily of his knees, but involving most of the joints in his body." (*Id.*) The ALJ noted this opinion invaded the province of the ALJ and he correctly gave it no weight. (Tr. at 25). *See Davidson*, 578 F.3d at 842. Dr. Thomas also expressed the opinion that based on Mr. Nablo's back pain (and then knee pain) he would have trouble bending over or stooping, but could sit. (Tr. at 544). At the time of Dr. Thomas's letter, Mr. Nablo was still in healing period post-bilateral knee surgeries which had occurred recently in the past two months. Dr. Thomas referenced the knee surgeries as requiring Mr. Nablo to be able to elevate his legs periodically but that Mr. Nablo could sit. (*Id.*) He thought Mr. Nablo would need an unscheduled break every ninety minutes to two hours, "may" miss work periodically, and "his ability to work would be at a reduced pace." (*Id.*)

The ALJ found that Dr. Thomas's "specific functional limitations of absences and reduced pace [were] vague and not supported" by Dr. Thomas's longitudinal treatment notes nor the notes of Drs. Greenwald or Gerbracht. The ALJ did, however, find that Dr. Thomas's notes supported a conclusion Mr. Nablo could perform work at the sedentary level.[1] (Tr. at 25).

---

[1] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying

A review of Dr. Thomas's notes supports the ALJ's determination. Dr. Thomas was Mr. Nablo's primary care physician for over thirty years, however, it appears only his notes/records pertaining to Mr. Nablo's asserted impairments are in the record. Most of the records concern steroid injections Dr. Thomas administered in one or both of Mr. Nablo's knees over the years prior to his bilateral knee surgeries in the summer of 2012. (Tr. at 343, 344, 345, 346-47, 385-88, 527-28, 541). There is no reference to Mr. Nablo's work capabilities in those notes. Furthermore, the primary focus of Dr. Thomas's letter is on Mr. Nablo's knees, which at the time the letter was written were still in the healing process. Dr. Greenwald's August 24, 2012 and October 9, 2012 notes that Mr. Nablo's knees were "super" post-surgery (Tr. at 653, 794) and the physical therapy discharge notes (Tr. at 700-701) contradict Dr. Thomas's assessment. Dr. Gerbracht's August and December 2012 notes following Mr. Nablo's knee surgeries confirm they were "well fitted" and that Mr. Nablo's osteoarthritis of his knees had been treated surgically. (Tr. at 661, 785).

Again, given this state of the medical records, the ALJ did not err in according less weight to the functional limitations concerning absences and pace offered by Dr. Thomas.

### 3.    Dr. Gerbracht

In a September 4, 2012 report Dr. Gerbracht expressed the opinions that Mr. Nablo could not sit six hours out of an eight-hour work day, would perform at a slower pace one-third of the time, and would miss three or more days a month from work. (Tr. at 546). The ALJ gave little weight to those opinions because they were not supported by Dr. Gerbracht's treatment notes and were inconsistent with the opinions of Dr. Greenwald and Dr. Thomas and with Mr. Nablo's own reported activities of daily living. (Tr. at 25-26). The ALJ referenced Dr. Gerbracht's treatment

out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a)

notes to the effect that Mr. Nablo's RA responded favorably to medication management "relatively quickly" and by December 12, 2012 was "clinically suppressed." (Tr. at 26, 27).

Preliminarily, the Court notes Dr. Gerbracht's opinions concerning Mr. Nablo's functional limitations are in a checklist format without explanation or reference to his treatment records. Opinions in this format generally are entitled to little evidentiary weight. *See Anderson v. Astrue,* 696 F.3d 790, 794 (8th Cir. 2012) (holding that a checkbox form has little evidentiary value when it "'cites no medical evidence, and provides little to no elaboration'") (quoting *Wildman v. Astrue,* 596 F.3d 959, 964 (8th Cir. 2010)); *Taylor v. Chater,* 118 F.3d 1274, 1279 (8th Cir. 1997) (holding that "[RFC] checklists, though admissible, are entitled to little weight in the evaluation of disability").

Secondly, the ALJ is correct that Dr. Gerbracht's opinion regarding Mr. Nablo's sitting capabilities is not supported by the opinions of Dr. Greenwald and Dr. Thomas. Both doctors thought Mr. Nablo could sit, Dr. Greenwald to the extent of six hours out of an eight-hour work day. (Tr. at 438, 544). Furthermore, Mr. Nablo testified that he spent much of his day sitting, but also went to church and was a leader for his grandson's Cub Scout den. (Tr. at 74-75, 77).

Finally, the ALJ thoroughly and accurately described Dr. Gerbracht's treatment notes. Mr. Nablo started out with stiffness in his shoulders and hips, recurrent stiffness and swelling in his fingers, tenosynovial swelling of some tendon sheaths and synovial swelling of some joints bilaterally in late 2011. (Tr. at 369). Once appropriate medication was started, Mr. Nablo's symptoms improved, with some adjustments of medications along the way. (*See, e.g.*, Tr. at 392, 384, 445-446, 454, 462-63). By April 25, 2012 Mr. Nablo was "actually quite free of any inflammatory joint symptoms." (Tr. at 679). By December 19, 2012 Dr. Gerbracht believed Mr.

Nablo's RA symptoms had been clinically suppressed. (Tr. at 786). Except for the September 4, 2012 report, Dr. Gerbracht's treatment notes do not mention functional limitations.

As with the other doctors, the ALJ did not err in according less weight to the functional limitations concerning sitting, absences and pace offered by Dr. Gerbracht. Based on the record as a whole, substantial evidence supports the ALJ's evaluation of the medical evidence and the weight given to the treating physicians' opinions concerning functional limitations.

## V.     REPORT AND RECOMMENDATION AND ORDER

As the ALJ noted in his decision, "this is a close case. A hard case." (Tr. at 22). After a thorough review of the entire record in accordance with the deferential standard of review, however, the Court concludes that the ALJ's determination that Mr. Nablo was not disabled within the meaning of the Act is supported by substantial evidence in the record when viewed as a whole. The decision of the ALJ should be affirmed. The undersigned recommends entry of judgment in favor of the defendant and against plaintiff dismissing the Complaint.

IT IS ORDERED that the parties have until **October 5, 2015** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of plaintiff's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

**IT IS SO ORDERED.**

Dated September 16, 2015.

_____
HELEN C. ADAMS
UNITED STATES MAGISTRATE JUDGE
